IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:05CV422-C

| | |
|---|---|
| JOHN M. CHURCH,  )<br>)<br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>WACHOVIA SECURITIES,  )<br>INC., and WACHOVIA  )<br>CORPORATION,  )<br>)<br>Defendants.  )<br>_____) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the "Plaintiff's Motion to Compel Discovery" (document #36) and "Memorandum in Support ..." (document #37), both filed September 25, 2006; and the "Defendants' Memorandum in Response ..." (document #41) filed October 26, 2006. On November 9, 2006, the Plaintiff filed his "Reply ..." (document #44).

This matter was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and the Plaintiff's Motion is now ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned will <u>grant in part</u> and <u>deny in part</u> the Plaintiff's Motion to Compel, as discussed below.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This is an action seeking damages, that is, unpaid bonuses and severance pay, pursuant to claims for breach of contract, violation of the North Carolina Wage and Hour Act, quantum meruit, breach of supplementary contract, and "severance benefits."

The Plaintiff is a citizen and resident of Charlotte, North Carolina. Defendant Wachovia Corporation is a North Carolina corporation headquartered in Charlotte, and the parent company of Defendant Wachovia Securities, Inc. It is undisputed that the Plaintiff was employed by the

Defendants, or their predecessors in interest, First Union Corporation and First Union National Bank (collectively "Wachovia"), from sometime in April 1996 through sometime in June 2005, when he voluntarily left his employment.

Accepting the allegations of the Complaint as true, sometime in 1996, while the Plaintiff was employed by G.E. Capital, Wachovia recruited him to create, develop, and serve as managing director of their commercial mortgage backed securities servicing organization ("CMBS"). According to a letter Wachovia sent him prior to his accepting the position, Plaintiff was to receive an annual salary of $125,000 and a guaranteed incentive payment of $150,000 for 1996.

The Plaintiff also alleges that CMBS employees would be eligible for annual bonuses to be paid from a pool equal to 9% of the CMBS's net profits, as determined under the terms of Wachovia's "Capital Markets Group Bank Products Origination 1996 Incentive Plan" ("Incentive Plan"), and that he would have the sole discretion to award the bonus pool entirely to himself or to apportion the bonus pool among himself and other CMBS employees.

The Plaintiff maintains that he was very successful as managing director of the CMBS, which by February 1997 was managing $25 billion in loans, up from $1.5 billion in mid-1996.

Also in February 1997, the Capital Markets Group was reorganized, and Plaintiff became managing director of Structured Product Services ("SPS"), which included in addition to CMBS, Residential Mortgage Servicing ("RMS"), Asset Backed Servicing ("ABS"), and Special Servicing ("SS"), and began reporting to Brian Simpson, head of the Structured Product Group ("SPG"). This reorganization brought the number of employees under Plaintiff's direct supervision to approximately 90.

The Plaintiff contends that at the end of 1997, he successfully resisted Mr. Simpson's attempt to decrease the CMBS bonus pool by including in the CMBS net profit calculation some

unspecified amount of losses that were not properly attributable to CMBS, and that Mr. Simpson ultimately approved a $1.1 million bonus pool for CMBS, based on the 9% formula contained in the original Incentive Plan. From that pool, the Plaintiff assigned himself a $400,000 incentive bonus, with the balance distributed among other employees at CMBS.

During 1998, Wes Jones became the Plaintiff's supervisor. The Plaintiff alleges that he discussed with Mr. Jones the Incentive Plan for 1998 and the payment of the CMBS 9% bonus, and that Mr. Jones told him that Wachovia's Compensation Committee, including Mr. Jones, Mr. Simpson and the Defendants' CEO Ken Thompson, had discussed reducing Plaintiff's bonus pool, but decided to maintain the CMBS bonus at 9% of net profit, because of both the commitments made to Plaintiff in 1996 and Wachovia's practice in prior years.

The Plaintiff maintains, however, that beginning in 1999, Wachovia calculated CMBS net profits differently, that is, in a manner that understated net profits and in such a fashion that "ma[de] it difficult [for Plaintiff] to determine the contracted for bonus pool at 9% of net income." "Complaint" at 4, Exhibit 1 to "Notice of Removal" (document #1). The Plaintiff also states that although he was repeatedly assured through 2003 by Mr. Simpson, Mr. Jones, and other senior managers that the CMBS bonus pool accurately reflected 9 % of CMBS net profits, he now believes that neither the pool nor his bonus as a portion of the pool were ever again based on the agreed 9% of CMBS net profits.

Sometime prior to June 2003, Bill Green became head of the SPG, and the Plaintiff further alleges that in June 2003, Mr. Green reorganized SPS, the Plaintiff's area of responsibility and, in the process, demoted him. After the reorganization, Plaintiff managed only Asset Backed Servicing ("ABS"), that is, his responsibilities for CMBS, Residential Mortgage Servicing ("RMS"), and Special Servicing ("SS") were taken from him.

3

The Plaintiff contends that Mr. Green demoted him because he had voiced a concern that Mr. Green's mismanagement of SPS was creating substantial financial risk which could lead to significant losses for Wachovia, that is, "Plaintiff's repeated protestations to Green about inadequate financial controls at SPS had earned him Green's enmity, causing Green to terminate Plaintiff's position at SPS and demote him, after Plaintiff complained to his superiors and Risk Management." Id. at 5.

The Plaintiff further alleges that when he complained to Mr. Green about the demotion, Mr. Green told him that he could resign or accept a further re-assignment and/or demotion. Plaintiff complained to Deidre Bradshaw of Wachovia's Human Resources Department and asked what his options were with regards to severance payments if he decided not to accept Mr. Green's re-assignment.

At that time, the Plaintiff was working on two very large transactions, one with GMACCM, totaling approximately $200 Billion ("Landslide"), and the other with G.E. Capital, totaling approximately $18 Billion ("Swordfish"). The Plaintiff contends that he was "uniquely qualified to acquire" Landslide and Swordfish because of his contacts at GMACCM and at G.E. Capital.

Accepting the Complaint as true, sometime later in 2003, and "[i]n order to retain [his] valuable services," Mr. Green and Ms. Bradshaw "enticed" Plaintiff "with a new job description that outlined a material and meaningful role as a managing director in Real Estate Capital Markets and as Industry Liaison for the Commercial Servicing Group, as well as Chairman of the Pricing Committee" and promised him that he would "earn a substantial bonus, commensurate with bonuses payable in the Capital Markets Group for originating new business and closing large transactions. In other words, bonuses in the range of 10% of net profit." Id. at 5-6.

The Plaintiff alleges that although he closed the Swordfish transaction in August 2004, which

he contends resulted in a net profit of $75 million dollars, in January 2005, Mr. Green gave him a "Below Expectations" performance evaluation and his bonus for 2004 was only $250,000, less than he had received the previous year.

In response, the Plaintiff told Mr. Green that he would request an "Enhanced Severance Package," as that term is defined in Wachovia's "Fourth Amended and Restated Wachovia Corporation Severance Plan" ("the Plan"), which, as discussed below, the undersigned has previously determined is an employee benefit plan governed by the Employment Retirement Income Security Act, 29 U.S.C. § 1001, et. seq. ("ERISA").

Although the Plaintiff was offered an enhanced severance package in an amount that is not disclosed in the record, he concluded that it was "wholly inadequate," and declined it.

Rather, sometime in June 2005, the Plaintiff quit his job, and on September 2, 2005, filed the subject Complaint in the Superior Court of Mecklenburg County, North Carolina, alleging four state law claims: breach of contract to pay an annual bonus in 1999 through 2003 based on 9% of CMBS profits, violation of the North Carolina Wage and Hour Act, quantum meruit, and breach of supplementary contract to pay an annual bonus in 2004 based on 10% of net profits in Real Estate Capital Markets, and a fifth claim for "severance benefits."

On October 5, 2005, the Defendants removed the state court action to federal court, alleging correctly that the Plaintiff's claim for severance benefits is, in fact, a claim "relating to" ERISA and, therefore, a basis for federal question jurisdiction. See "Memorandum and Order" at 5 (document #9) (denying Plaintiff's Motion to Remand, subject matter jurisdiction exists because Plaintiff's fifth "claim expressly seeks 'severance benefits' under the Defendants' 'policies' – an unmistakable reference to payments available, if at all, only under the terms of the Plan" and therefore relates to and is preempted by ERISA).

5

On February 10, 2006, the Plaintiff served its "First Set of Interrogatories" and "First Request for Production of Documents," including all emails generated during the previous 10 years by the Plaintiff or any of more than more than 50 other Wachovia employees, including Mr. Green, Mr. Jones, and Ms. Bradshaw, that related to the Plaintiff or his compensation.

On April 28, 2006, the Defendants served their discovery responses, which only included emails that Wachovia had retrieved from the "G drive" of the computer that Plaintiff had used prior to resigning, that is, emails that had been authored by or addressed to the Plaintiff between 1996 and 2005. As to other responsive emails, the Defendants maintained that the Plaintiff's requests were overbroad and burdensome.

For the next several months, counsel engaged in extensive discussions, including three meetings, in an attempt to resolve the emails dispute. Ultimately, in a June 12, 2006 letter, the Plaintiff narrowed its discovery request to otherwise responsive emails authored by or addressed to himself and 11 other Wachovia employees (including Mr. Green, Mr. Jones, and Ms. Bradshaw) between June 2003 and July 2005, but the Defendant did not produce any additional emails, other than copies of those previously produced that had been recovered from the Plaintiff's computer. Instead, in early September, defense counsel advised Plaintiff's counsel that "internal emails" (both authored by <u>and</u> addressed to other Wachovia employees) generated prior to July 2004 and "external emails" (authored by <u>or</u> addressed to a Wachovia employee, but having either an outside author or recipient) created prior to July 2003 were technologically unrecoverable without resort to backup media which was prohibitively expensive.

On September 25, 2006, the Plaintiff filed the subject Motion to Compel production of emails within the same narrowed scope.

In their Response, the Defendants contend that they "did not have the technology infrastructure in place prior to July 1, 2004 that would allow easy access and searches of internal

email without resort to backup media for that data." Document #41 at 3. Specifically, prior to July 1, 2004, Wachovia did not utilize an email-specific storage system, and emails created prior to that date could be recovered only through restoring the information on Wachovia's system-wide "disaster recovery backup media," that is, a periodic backup of Wachovia's entire computer network. Wachovia credibly maintains that the such an operation would cost $341,000 and consume 344 days, including the time necessary to search the restored data for responsive emails.

On July 1, 2004, Wachovia's Corporate Investment Banking Division ("CIB"), of which the CMBS unit was a part, began using a "CIB Assentor" to "capture" and store a copy of every internal email sent between CIB employees, including those who are the subject of the Plaintiff's discovery requests. The Defendant contends, however, that production of even those responsive internal emails authored or received by the 12 individuals in the Plaintiff's narrowed scope would cost $292,860, primarily because, as with the disaster recovery backup, the body of emails would have to be searched to identify responsive emails.

Although the Defendants object to producing any additional emails, they state that the majority of the information that the Plaintiff seeks could be obtained at considerably less cost by searching the CIB Assentor files for internal emails authored by or addressed to Mr. Green, Ms. Bradshaw, or Ben Williams, Mr. Green's supervisor, and that contained the Plaintiff's name either on the subject ("Re:") line or somewhere in the body of the text.

In his Reply, and in addition to requesting an order compelling production within the scope of his counsel's June 12 letter, the Plaintiff seeks sanctions in the form of a spoilation of evidence jury instruction. Such a determination must be made, however, at trial by the District Judge to whom this case is assigned (the Honorable Robert J. Conrad, Jr.), although the undersigned notes that there is not presently in the record any evidence of the type of bad faith necessary to support such an instruction.

The Plaintiff's Motion to Compel has been fully briefed and is, therefore, ripe for determination.

## II. DISCUSSION

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

The rules of discovery are to be accorded broad and liberal construction. See Herbert v. Lando, 441 U.S. 153, 177 (1979); and Hickman v. Taylor, 329 U.S. 495, 507 (1947). However, a litigant is not entitled to conduct discovery that is intended to harass, annoy, embarrass, or oppress the opposing party, or that is unduly burdensome. See Fed. R. Civ. P. 26(c). Whether a request is unduly burdensome depends on whether the cost is "substantial; not whether it is modest in relation to ability to pay." Oppenheimer Fund, Inc., v. Sanders, 437 U.S. 340, 361-62 (1978).

Whether to grant or deny a motion to compel is generally left within the district court's broad discretion. See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 929 (4th Cir. 1995) (district courts' rulings on discovery motions reviewed on appeal for abuse of discretion); Erdmann v. Preferred Research Inc., 852 F.2d 788, 792 (4th Cir. 1988) (noting district court's substantial discretion in resolving motions to compel); and LaRouche v. National Broadcasting Co., 780 F.2d 1134, 1139 (4th Cir. 1986) (same).

The parties have not cited, and the undersigned is unaware of, any binding authority addressing the issue of the production of electronic data from backup media. However, courts that have considered the issue have applied a balancing test to determine whether the cost of obtaining

8

documents was reasonable in light of the scope of discovery, its relevance to the claims at issue, and its potential utility. See, e.g., Zubulake v. UBS Warburg, LLC, 217 F.R.D. 309, 316 (S.D.N.Y. 2003) ("Zubulake I") (discussing the complications and expense in discovery where electronic evidence is contained only on "expensive-to-restore backup media"); Zubulake v. UBS Warburg, LLC, 216 F.R.D. 280, 284, n.31 (S.D.N.Y. 2003) ("Zubulake III") (applying balancing test); Rowe Entm't, Inc., v. William Morris Agency, Inc., 205 F.R.D. 421, 429 (S.D.N.Y. 2002) (same); and McPeek v. Ashcroft, 202 F.R.D. 31, 33-34 (D.D.C. 2001) (same).

As the Plaintiff concedes, a proposed amendment to the Rules of Civil Procedure, that may take effect as early as December 1, 2006, provides that absent a court order, a responding party need not produce electronically stored information that "is not reasonably accessible because of undue burden or cost." Proposed Rule and Committee Note, Rule 26(b)(2), Report of the Judicial Conference Committee on Rules of Practice and Procedure at 30 (September 2005).

Applying these principles to the facts in this case, and balancing the Plaintiff's right to conduct meaningful discovery with the Defendant's right to avoid burdensome costs, the undersigned concludes that the Defendant should be required to produce emails that were generated on or after July 1, 2004 (nearly one year before the Plaintiff resigned), that is, emails that are stored on the Defendants' CIB Assentor system, rather than the disaster recovery backup media, and that are readily "searchable" in that they make specific mention of the Plaintiff, either in the subject line or the body of the text. Production will also be limited to emails authored by or addressed to Mr. Green, Ms. Bradshaw, Mr. Jones, or Mr. Williams, the former three being the only Wachovia employees that the Plaintiff has even mentioned in his briefs, much less made a showing that their emails might lead to the discovery of relevant evidence. Additionally, because the Defendants admit that Mr. Williams may also have authored or received otherwise responsive emails within the same time period, they will be compelled to produce those documents as well.

## III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. The "Plaintiff's Motion to Compel Discovery" (document #36) is **GRANTED IN PART** and **DENIED IN PART**, that is, <u>on or before December 22, 2006, the Defendants shall produce internal emails that were authored by or addressed to Bill Green, Wes Jones, Deidre Bradshaw, and/or Ben Williams, that were created on or after July 1, 2004, and that contain the Plaintiff's name either on the subject line or within the body of the text</u>; and the Plaintiff's Motion is **DENIED** in all other respects.

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties; <u>and to the Honorable Robert J. Conrad, Jr.</u>.

**SO ORDERED.**

Signed: November 14, 2006

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge