# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

### CIVIL CASE NO. 3:05cv422

| | |
|---|---|
| JOHN M. CHURCH,       ) <br>       ) <br>         Plaintiff,     ) <br>       ) <br>         vs.         ) <br>       ) <br> WACHOVIA SECURITIES,   ) <br> INC. and WACHOVIA     ) <br> CORPORATION,       ) <br>       ) <br>         Defendants.   ) <br> _____ ) | **O R D E R** |

THIS MATTER is before the Court on the Defendants' Motion for Summary Judgment on Plaintiff's First, Second, Third and Fourth Claims for Relief [Doc. 70]; the Defendants' Motion to Exclude Plaintiff's Proposed Expert [Doc. 72]; the Plaintiff's Motion to Reconsider Magistrate's Memorandum and Order of July 2, 2008 [Doc. 81]; Plaintiff's Motion to Exclude Defendant's Proposed Expert Testimony [Doc. 83]; and Plaintiff's Motion for Leave to File Plaintiff's Supplemental Memorandum in Support of Motion to Exclude Defendant's Proposed Expert Testimony [Doc. 85].

## I.    PROCEDURAL HISTORY

On September 2, 2005, the Plaintiff John M. Church brought this action against the Defendants Wachovia Securities, Inc. and Wachovia Corporation (collectively "Wachovia") in the Mecklenburg County General Court of Justice, Superior Court Division, asserting claims for unpaid bonus compensation and severance benefits.  [Doc. 1-2].  Wachovia removed the action to this Court on October 5, 2005, on the grounds that Wachovia's severance plan is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et seq. ("ERISA") and thus the Plaintiff's claim for severance benefits presents a federal question under 28 U.S.C. §1331.[1]  [Doc. 1].

On October 5, 2005, Wachovia filed a Motion for Partial Dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, seeking dismissal of the Plaintiff's state law claims for breach of contract, violation of the North Carolina Wage and Hour Act, N.C. Gen. Stat. §25.1, et seq.; *quantum meruit*; and breach of supplementary contract.  [Doc. 2].  On January 5, 2006, the Honorable Carl Horn, III, United States Magistrate Judge, entered a Memorandum and Recommendation [Doc. 23], finding that

---

[1]The Plaintiff filed a motion seeking a remand to state court, but this motion was denied.  [Doc. 9].

the Plaintiff's Complaint adequately stated these state law claims and alleged facts which, if taken as true, were sufficient to toll the applicable statutes of limitations. Accordingly, Magistrate Judge Horn recommended that Wachovia's Motion to Dismiss be denied in its entirety. [Id.]. No objections were filed, and Judge Conrad accepted the Magistrate Judge's Recommendation on September 29, 2006. [Doc. 38].[2]

A Pretrial Order and Case Management Plan entered on January 24, 2006, ordered the completion of discovery by November 1, 2006 and the filing of dispositive motions by December 1, 2006. [Doc. 27]. By request of the parties, these deadlines were extended on July 12, 2006, with the discovery deadline extended to January 30, 2007, and the motions deadline extended to March 1, 2007. [Doc. 34].

On September 25, 2006, the Plaintiff filed a Motion to Compel the production of certain internal emails from the Defendants. [Doc. 36]. On November 14, 2006, Magistrate Judge Horn entered an Order granting in part and denying in part the Plaintiff's Motion. [Doc. 45]. The Plaintiff filed a

_____

[2]This case was initially assigned to Magistrate Judge Horn; however, the parties refused to consent to magistrate judge jurisdiction. Accordingly, on November 18, 2005, this matter was reassigned to the Honorable Robert J. Conrad, Jr. and referred to Magistrate Judge Horn pursuant to 28 U.S.C. §636(b)(1)(B).

Motion to Reconsider Magistrate Judge Horn's Order on November 22, 2006. [Doc. 46]. In light of the pending Motion for Reconsideration, the parties moved for another extension of the scheduling deadlines, which Magistrate Judge Horn granted on January 16, 2007. The deadline for completing discovery was thereby extended to March 31, 2007 and the deadline for filing dispositive motions was extended to April 30, 2007. [Doc. 52]. On March 13, 2007, Judge Conrad, acting *sua sponte*, stayed all deadlines in this case until a ruling could be made on the Plaintiff's Motion to Reconsider. [Doc. 54].

On July 26, 2007, Judge Conrad held a hearing to address the Plaintiff's Motion for Reconsideration. Shortly after this hearing, however, and before an Order was entered memorializing Judge Conrad's rulings, this matter was reassigned to the undersigned.

The Plaintiff filed an Amended Complaint on September 26, 2007, alleging the same causes of action as stated in the original Complaint but asserting additional factual allegations. [Doc. 61].

On January 30, 2008, the Court entered an Order, directing the parties to file a joint status report regarding the status of the parties' discovery dispute in light of the July 26, 2007 hearing. [Doc. 63]. Following the filing of the parties' status report [Doc. 64], the Court entered an Order [Doc. 65],

memorializing Judge Conrad's oral rulings from the July 26, 2007 hearing and granting the Plaintiff's Motion to Reconsider. Thereafter, the Court entered an Amended Pretrial Order and Case Management Plan, extending the deadline for discovery completion until April 30, 2008, extending the deadline for the filing of dispositive motions until May 30, 2008, and setting this matter for trial. [Doc. 66].

On April 30, 2008, Wachovia filed a Motion to Compel, seeking to compel the Plaintiff to produce his income tax returns and all supporting statements and schedules for the years 1995 to 2005. [Doc. 67]. The Plaintiff filed a Memorandum in Opposition to Wachovia's Motion, arguing that the discovery request was unreasonable and oppressive. [Doc. 69]. In this responsive brief, the Plaintiff further requested that the Court impose sanctions against Wachovia for its "unwarranted delays in producing e-mail correspondence first requested in March, 2006 ...." [Doc. 69 at 2]. Magistrate Judge Horn entered an Order granting Wachovia's Motion to Compel but denying the Plaintiff's request for sanctions on July 2, 2008. [Doc. 80]. On July 14, 2008, the Plaintiff filed a Motion to Reconsider the Magistrate Judge's July 2, 2008 Order. [Doc. 81]. Wachovia has a filed a brief in opposition to Plaintiff's motion. [Doc. 82].

On May 30, 2008, Wachovia filed a Motion for Summary Judgment with respect to the Plaintiff's claims for breach of contract, violation of the North Carolina Wage and Hour Act, *quantum meruit*, and breach of supplementary contract. [Doc. 70].[3] The Plaintiff filed a Memorandum in Opposition to this Motion on June 16, 2008 [Doc. 76], and Wachovia has filed a Reply [Doc. 78]. Additionally, both parties have filed motions seeking to exclude the other's expert on the issue of damages. [Docs. 72, 83]. On November 19, 2008, the Plaintiff filed a motion seeking leave to file a supplemental memorandum in support of its Motion to Exclude Defendant's Proposed Expert Testimony. [Doc. 85]. Wachovia does not oppose the filing of this supplemental memorandum by Plaintiff [Doc. 88].

These matters having been fully briefed, the Court finds that these motions are now ripe for disposition.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

---

[3]Wachovia does not move for summary judgment with respect to the Plaintiff's claim for severance benefits. [Id.].

issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d (1986)) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id.

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. Furthermore, neither unsupported

speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

Id. (internal citations and quotation marks omitted). Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Factual Background

The forecast of evidence, taken in the light most favorable to the Plaintiff, shows the following. In February 1996, while employed by GE Capital, the Plaintiff was approached by Ross Annable ("Annable") and Brian Simpson ("Simpson") of Wachovia's predecessor, First Union Corporation ("FU")[4], regarding a position in FU's commercial mortgage backed securities ("CMBS") servicing organization. [Deposition of John M. Church ("Pl. Dep."), Doc. 71-2 at 8; Affidavit of John Church ("Pl. Aff."), Doc. 76-3 at ¶3].

---

[4]FU merged with Wachovia Corporation on September 1, 2001. [Doc. 71 at 3 n.5].

8

In March 1996, Annable sent the Plaintiff an offer letter, which provided the terms of Plaintiff's compensation. Specifically, the Plaintiff was offered an annual salary of $125,000, and a guaranteed incentive payment of $150,000 for the first year. [Pl. Dep. Ex. 3, Doc. 71-2 at 66]. The Plaintiff accepted these terms. [Pl. Aff., Doc. 76-3 at ¶8]. During the course of discovery, the Plaintiff produced a copy of this offer letter from his personal file which contains his handwritten notes stating, "Profitable of department, also include annual incentive bonus based on department's profits and accomplishments. TBD [to be determined]." [Pl. Dep. Ex. 4, Doc. 71-2 at 70]. The Plaintiff explained that he made these handwritten notes after having "a conversation over a period of time" with Annable "about getting a percentage of the business," [Pl. Dep., Doc. 76-6 at 17], though this was not reflected in the Plaintiff's offer letter.

Pursuant to the 1996 Incentive Compensation Program, the Commercial Servicing Department's annual bonus pool, from which all individual bonuses to employees in that department would be paid, was to be nine percent (9%) of the department's net profits. [Pl. Dep. Ex. 6, Doc. 71-2 at 88]. Any distributions from the pool to employees were to be made on a subjective basis by the Plaintiff, as manager of the department. [Id.]. Per the agreement

confirmed in the Plaintiff's offer letter, the Plaintiff received the guaranteed bonus amount of $150,000 from this pool for the year 1996. [Pl. Dep., Doc. 71-2 at 11; Pl. Dep. Ex. 3, Doc. 71-2 at 65]. Annable and Simpson had been authorized by Louis A. Schmitt, the Managing Director of FU's Capital Markets Group, to offer the Plaintiff compensation based upon salary and an annual bonus to be based upon a percentage of the net income of his servicing business unit, [Affidavit of Louis A. Schmitt ("Schmitt Aff."), Doc. 76-4 at ¶¶3, 6], but no such offer was incorporated into the Plaintiff's offer letter or the 1996 Compensation Program.

In February 1997, the Plaintiff's business unit was reorganized, and the Plaintiff began reporting to Brian Simpson, the new head of Structured Products Group ("SPG"). The Plaintiff was promoted to Managing Director of Structured Products Services ("SPS"), which included commercial servicing, and new commercial, residential, and consumer asset-backed loans. [Pl. Aff., Doc. 76-3 at ¶13].

The Plaintiff had no bonus guarantee for 1997. The 1997 Incentive Compensation Program provided for a bonus pool for the Plaintiff's business unit based on target percentages of the unit's net income before taxes based on the profit margin of the group. [Pl. Dep. Ex. 8, Doc. 71-2 at 105]. By its

express terms, the 1997 Incentive Compensation Program applied from January 1, 1997 to December 31, 1997. [Pl. Dep., Doc. 71-2 at 13; Pl. Dep. Ex. 8, Doc. 71-2 at 97]. At the end of 1997, a $1.1 million bonus pool was assigned to SPS, based on the 9% formula outlined in the 1997 Incentive Compensation Program. Of that bonus pool, the Plaintiff assigned himself an incentive bonus of $400,000 in bonus compensation, with the balance distributed by him to his employees at SPS. [Pl. Dep., Doc. 71-2 at 14-15; Pl. Aff., Doc. 76-3 at ¶14].

The 1998 Incentive Compensation Program, which was effective from January 1, 1998 through December 31, 1998, also provided for a bonus pool for the Plaintiff's business unit to be determined based upon target percentages of net profit for the group. [Pl. Dep., Doc. 71-2 at 16; Pl. Dep. Ex. 9, Doc. 71-2 at 119]. The percentage bonus system was refined, however, such that rather than there being a fixed percentage of net income before taxes used to determine the bonus pool, there would be an increasing scale based upon the profit margin of the profit center managed by the Plaintiff. As the profit margin increased, the bonus pool as a percentage of net income before taxes also increased for SPS. [Pl. Aff., Doc. 76-3 at ¶18]. The Plaintiff received a total of $800,000 in bonus compensation for 1998

pursuant to this Incentive Compensation Program. [Pl. Dep., Doc. 71-2 at 17]. The Plaintiff did not consider the $800,000 bonus to violate any contractual obligation that FU owed to him with respect to bonus compensation. [Id. at 18].

Beginning in 1999, the manner for determining business unit incentive pools under the annual incentive plans was changed to a subjective plan where both bonus pools and individual bonuses were determined at the discretion of management. [Deposition of Deidre Bradshaw ("Bradshaw Dep."), Doc. 71-9 at 16, 21, 23]. The Plaintiff was made aware of the change to FU's incentive plans through various meetings which were held in 1999. [Pl. Dep., Doc. 71-2 at 22-30; Bradshaw Dep., Doc. 71-9 at 24-25]. Specifically, the 1999 Incentive Compensation Program provided, in pertinent part, as follows:

> The subjective bonus pools will be produced for Structured Products (and allocated to its sub-organizations) based on a variety of factors, among them:
>
> • A calculation of organizational profit before tax[es]
>
> • An assessment of overall organization success in meeting non-financial, as well as financial, objectives

- Historical bonus payout practices

- Competitive compensation market conditions

- Overall performance of Capital Markets Group, and the contextual contributions of Structured Products (and its sub-organizations) to this performance level[.]

[Pl. Dep. Ex. 10, Doc. 71-3 at 2]. To implement this new system for determining bonuses, FU devised a series of management tools, including balanced scorecards, which were used to measure the performance of the business unit, and 9 box exercises and 360 reviews, which were designed to measure the performance and potential of employees within the unit. [Pl. Dep., Doc. 71-2 at 22-30; Bradshaw Dep., Doc. 71-9 at 17-18, 22]. These tools required a variety of subjective determinations. [Pl. Dep. Ex. 12, Doc. 71-3 at 6; Affidavit of Deidre Bradshaw ("Bradshaw Aff."), Doc. 71-6 at ¶9; Deposition of Ben Williams ("Williams Dep."), Doc. 71-9 at 28-29]. The Plaintiff testified he used the nine box analysis and forced rankings to assess and rank his employees, [Pl. Dep., Doc. 71-2 at 44-45; Pl. Dep. Ex. 28, Doc. 71-4 at 25], and that his managers used the same tool to evaluate and rank him. [Pl. Dep., Doc. 71-2 at 45].

The Plaintiff was never offered any documents to sign, nor did FU ever ask for his approval to change the manner in which the Plaintiff's bonus compensation was calculated. The Plaintiff states in his Affidavit that he "repeatedly protested to FU about the purported changes to a subjective system of bonuses." [Pl. Aff., Doc. 76-3 at ¶24].

The Plaintiff received a bonus of $675,000 for the year 1999. The Plaintiff testified that this bonus was not consistent with his agreement to have his bonus compensation calculated based on a percentage of his department's net income before taxes and accordingly, he considered this bonus payment to be a breach of his contract. [Pl. Dep., Doc. 71-2 at 20-21]. The Plaintiff, however, took no action regarding such perceived breach until he filed this action in 2005.

In 2000, the Plaintiff attended a series of meetings concerning the development of the 2000 Incentive Compensation Program. [Id. at 25]. The Plaintiff worked with Deidre Bradshaw, the H.R. Business partner for his group, to draft the SPS Compensation Scorecard that was incorporated in the 2000 Incentive Compensation Program. [Id. at 31-32, 34; Pl. Dep. Ex. 14 and 16, Docs. 71-3 at 17 and 19]. This scorecard gave weight to various categories, including financial, risk management, portfolio and information

management, commitment to people and quality service to clients. Additionally, these categories included a number of subjective factors, such as an employee's commitment to the team, commitment to the professional development process, personal accountability, and business development. [Pl. Dep. Exs. 12, 14, 16, Doc. 71-3 at 6, 16, 19]. The Plaintiff understood the purpose of the scorecard was to communicate criteria concerning compensation. [Pl. Dep., Doc. 71-2 at 24]. This scorecard was used by the Plaintiff in determining bonuses for his employees. [Id. at 25-30]. This scorecard also was used by the Plaintiff's supervisors in determining the Plaintiff's bonus compensation. [Bradshaw Aff., Doc. 71-6 at ¶10].

Also attached to the 2000 Incentive Compensation Program was a document entitled "Linkage between Scorecard and Incentive Payments," which stated, in pertinent part:

1.    A *subjective bonus pool* will be produced for Structured Products and Real Estate Capital Markets based on a variety of considerations, including but not limited to:

  •    Overall profitability of the group

  •    An assessment of overall group productivity

- An evaluation of the effective use of capital

- Historical bonus payouts

- Competitive compensation market conditions

- Overall performance of First Union Corporation

2. This bonus pool will be *subjectively divided* among the operating businesses within Structured Products and Real Estate Capital Markets based on market compensation levels and on the business units' Balanced Scorecard results. The Balanced Scorecards will include financial and non-financial indicators designed to measure the overall performance of the business units.

3. *Individual compensation decisions will be made subjectively* by the Business Unit head, the Managing Director of Structured Products and Real Estate Capital Markets, and the Capital Market Co-heads. Determinants will include market compensation levels, individual performance as measured by 360 reviews and managers' performance evaluations, and other factors including direct impact on profitability.

[Pl. Dep. Ex. 14, Doc. 71-3 at 18] (emphasis added).

In 2000, the Plaintiff received a memo entitled "Compensation Communication, Manager Talking Points," which included talking points for

compensation communications with employees in his group. This memo reiterated that numerous factors were considered in determining an individual's annual incentive payment, including the performance of the employee's specific business unit; the performance of the company as a whole; the performance of the overall financial industry; and the individual employee's contribution. [Pl. Dep., Doc. 71-2 at 36-37; Pl. Dep. Ex. 19, Doc. 71-3 at 55; Bradshaw Aff., Doc. 71-6 at ¶12; Bradshaw Aff. Ex. J, Doc. 71-8 at 29]. Thirteen managers, including the Plaintiff and his managers, received these talking points memoranda each year in preparation for their bonus discussions with their employees. [Bradshaw Aff., Doc. 71-6 at ¶12]. Beginning in January 2002, these memos specifically referred to "year end subjective incentive payments." [Bradshaw Aff. Ex. J, Doc. 71-8 at 33, 35, 37].

The Plaintiff received a bonus of $665,000 for the year 2000. The Plaintiff considered this payment to be too low, and he considered it a violation of FU's contractual obligation to pay him a bonus based on a percentage of the department's net income before taxes. [Pl. Dep., Doc. 71-2 at 33].

In 2001, the Plaintiff received a bonus payment of $750,000, which he considered to be a breach of his contract because the payment was not calculated on a percentage of net income before taxes. [Pl. Dep., Doc. 71-2 at 39].

On September 3, 2002, Church received a memo via e-mail regarding Wachovia's incentive compensation philosophy. [Id. at 42-43; Pl. Dep. Ex. 26, Doc. 71-4 at 22]. It specifically stated, "[i]n all cases, performance will be evaluated utilizing a variety of objective and subjective factors as defined by each business unit" and "[a]ll business unit pools will be determined subjectively . . . ." [Pl. Dep. Ex. 26, Doc. 71-4 at 23]. The Plaintiff acknowledged receipt of the e-mail. [Pl. Dep., Doc. 71-2 at 42-43]. The Plaintiff's bonus for 2002 was $800,000. The Plaintiff considered this payment to be a violation of his contract because the bonus was not based upon his "percentage deal." [Id. at 48].

During the first half of 2003, the Plaintiff's supervisor, William Green, had continuing concerns about the Plaintiff' s performance in managing the SPS Group. [Deposition of William C. Green ("Green Dep."), Doc. 71-9 at 38-51; Green Dep. Ex. 11, Doc. 71-9 at 57]. In June 2003, Green decided to remove the Plaintiff from SPS operations. The Plaintiff was offered a new

strategic initiatives role with management responsibility only for the Asset Backed Servicing ("ABS") group. [Pl. Aff., Doc. 76-3 at ¶34; Bradshaw Aff., Doc. 71-6 at ¶13]. The Plaintiff testified that Green told him his bonus range in the new job would be between $350,000 and $500,000. [Pl. Dep., Doc. 71-2 at 49-50]. The Plaintiff admits that he was not promised a percentage bonus arrangement in connection with this new position. [Id. at 50]. The Plaintiff received an offer letter with the terms of the new job, stating he would be a participant in the Fixed Income Incentive Program. [Pl. Dep. Exs. 30, 31, Doc. 71-4 at 30, 33]. Although the Plaintiff did not sign the offer letter, he began working in this new position. [Pl. Dep., Doc. 71-2 at 51].

In October 2003, the Plaintiff attended two offsite meetings where Wachovia's use of a subjective bonus plan was discussed and communicated in writing. Wachovia reiterated via written PowerPoint slides: "REPEAT: We have a subjective compensation plan – no hard % deals." [Id. at 35; Pl. Dep. Ex.18, Doc. 71-3 at 53]. Later that same month, the Plaintiff attended an October 22, 2003 offsite meeting where it was again reiterated via written PowerPoint slides that there are "[n]o individual formulaic incentive payouts in fixed income [incentive program]." [Pl. Dep., Doc. 71-2 at 54-55; Pl. Dep. Ex. 34, Doc. 71-5 at 14]. The Plaintiff did not express any objection to these

19

statements during or after these meetings. [Pl. Dep., Doc. 71-2 at 55-56].

Beginning in late 2003, Wachovia's incentive plans were posted on its intranet annually and were readily accessible by the Plaintiff. [Bradshaw Aff., Doc. 71-6 at ¶8].

The Plaintiff testified, by way of affidavit, that from 1999 to 2003, he was "repeatedly told by Wachovia that the so-called 'subjective' incentive plans were based on certain defined criteria, such as one's historical pay, market value and most importantly the performance of the business unit" and that he was "assured that I would be paid for performance as I had been in the past." [Pl. Aff., Doc. 76-3 at 9 ¶25]. He states that although Wachovia agreed to pay him an annual bonus based on a percentage of his department's net income before taxes, "Wachovia continually, after 1998[,] breached that agreement by understating profits for my department and using a methodology that prevented me from determining independently the amount of my department's actual profits." [Id. at ¶26]. As such, the Plaintiff "was forced to rely upon Wachovia's repeated assurances that the net profit calculation was accurate," and the Plaintiff states that he "had no reason to suspect that net profits had been understated until sometime after I received my 2003 bonus." [Id. at

¶27]. The Plaintiff received a bonus of $350,000 for the year 2003. [Pl. Dep., Doc. 71-2 at 57].

By January 2005, Green had determined that the Plaintiff was making no progress in his job. [Green Dep., Doc. 71-9 at 37]. The Plaintiff had only one prospective deal in the pipeline and an effort to move the Plaintiff into another group was not successful because the group refused to take him. [Id. at 33-37]. In January 2005, the Plaintiff received a "basically meets expectations" rating on his 2004 performance review and received a bonus of $250,000 for 2004. [Pl. Dep., Doc. 71-2 at 64; Pl. Dep. Ex. 51, Doc. 71-5 at 25]. The Plaintiff expressed dissatisfaction with the amount of his bonus and his performance rating. The Plaintiff decided to explore exit options and to determine whether he qualified for a severance package. [Pl. Dep., Doc. 71-2 at 62-63]. In June 2005, he was offered a severance package, but the Plaintiff found it to be "wholly inadequate" and he left without accepting it. [Bradshaw Aff., Doc. 71-6 at ¶14; Pl. Aff., Doc. 76-3 at ¶¶42-43].

Under the terms of the 2005 Incentive Compensation Program, the Plaintiff was not eligible for a bonus for the partial year that he was employed in 2005 because he was not employed on the Pay-Out Notification Date, i.e., the date on which participants are informed of the amount of their incentive

award, which generally occurs after the end of the performance year, in late January of the following year.  [Bradshaw Aff., Doc. 71-6 at ¶15].

## C.    Analysis

Wachovia moves for summary judgment as to the Plaintiff's state law claims, arguing that the majority of the Plaintiff's claims are barred by the statute of limitations. [Doc. 71 at 12-13].  Wachovia contends that to the extent that the Plaintiff's breach of contract claim is not time barred, it fails as a matter of law because (1) Plaintiff cannot prove entitlement to any "percentage deal"; (2) there was no breach of any bonus obligation; and (3) in any event, the Plaintiff waived any breach by continuing to perform.  [Id. at 13-23].  Wachovia further argues that the Plaintiff's claim based upon a violation of the North Carolina Wage and Hour Act must fail as a matter of law because the Plaintiff received written notice of changes to the incentive plans and because he accepted a new job in 2003.  [Id. at 23-24].  With respect to the Plaintiff's claim for *quantum meruit*, Wachovia argues that this claim must be dismissed because a claim for *quantum meruit* cannot stand where an express contract exists.  [Id. at 24-25].  Finally, with respect to the Plaintiff's claim for breach of supplementary contract, Wachovia argues that this claim must fail because no supplementary contract was ever created.  [Id. at 25].

In response, the Plaintiff contends that these same arguments were raised in Wachovia's Motion to Dismiss, and because that Motion was denied, the law of the case doctrine precludes Wachovia for reasserting these arguments in the present Motion. [Doc. 76 at 6-8]. The Plaintiff argues that none of his claims are barred by the statute of limitations, as the doctrine of equitable estoppel precludes Wachovia from asserting this defense. [Id. at 12-14]. With respect to Wachovia's arguments as to the merits of Plaintiff's state law claims, the Plaintiff argues that he has valid claims for breach of contract, breach of supplementary contract, *quantum meruit*, and violation of the North Carolina Wage and Hour Act, and that there are genuine issues of material fact which render summary judgment inappropriate as to these claims. [Id. at 14-25]. The Court will address each of these arguments in turn.

### 1. Law of the Case

Under the doctrine of the law of the case, "when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 815-16, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382,

1391, 75 L.Ed.2d 318 (1983)).  The law of the case doctrine does not preclude granting a motion for summary judgment on issues previously addressed by a motion to dismiss, as these motions are evaluated under different standards.  In evaluating a Rule 12(b)(6) motion, the court must "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff."  Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).  The relevant inquiry is whether the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level."  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).  A complaint will survive a Rule 12(b)(6) motion to dismiss if it sets forth "enough facts to state a claim to relief that is plausible on its face."  127 S.Ct. at 1974.  By contrast, a Rule 56 motion requires the production of *evidence*.  See Bouchat, 346 F.3d at 522.  If the party seeking summary judgment carries its initial burden of demonstrating the absence of a genuine issue of material fact, the burden to produce a forecast of evidence demonstrating that a triable issue of fact exists.  Id.  Given these standards, the denial of a motion to dismiss does not necessarily preclude the renewal of the same arguments later in a motion for summary judgment.  See PDK Laboratories, Inc. v. Ashcroft, 338 F.Supp.2d 1, 7 (D.D.C. 2004) ("In general,

'the ruling on a motion to dismiss for a failure to state a claim for relief is addressed solely to the sufficiency of the complaint and does not prevent summary judgment from subsequently being granted based on material outside the complaint.'"). Of course, a motion for summary judgment made on the same legal grounds and with the same factual showing that was the basis of a previous motion to dismiss may be subject to denial under the law of the case doctrine. Id.

While Wachovia's Motion for Summary Judgment asserts legal grounds that are similar to those raised in its Motion to Dismiss, Wachovia has made a different factual showing than it was procedurally able to do in its previous motion. Specifically, Wachovia's Motion to Dismiss relied upon, and assumed the truth of, the Plaintiff's allegations as stated in the Complaint, whereas the Motion for Summary Judgment is supported by a forecast of evidence, in the form of affidavits and deposition testimony. These materials were not available, much less presented, at the time Wachovia's Motion to Dismiss was filed. Given the differences in the proof presented in support of these two motions, the disposition of Wachovia's previous Motion to Dismiss does not serve as the law of the case on the legal issues raised in the Motion for

Summary Judgment.  Plaintiff's argument to the contrary is simply without merit.

## 2.    Statute of Limitations

The Plaintiff's claims for breach of contract, breach of supplementary contract, and *quantum meruit* are subject to a three-year statute of limitations. See N.C. Gen. Stat. §1-52(1) (three-year limitation period for actions on contracts, express or implied); Hicks v. Hicks, 13 N.C. App. 347, 350-51, 185 S.E.2d 430, 432-33 (1971) (applying three-year limitations period to *quantum meruit* claim).  The Plaintiff's claim for unpaid wages under the North Carolina Wage and Hour Act is subject to a two-year statute of limitations.  N.C. Gen. Stat. §95-25.22(f).  The statute of limitations period begins to run at the time of the breach giving rise to the claim.  Penley v. Penley, 314 N.C. 1, 20, 332 S.E.2d 51, 62 (1985); U.S. Leasing Corp. v. Everett, Creech, Hancock, and Herzig, 88 N.C. App. 418, 426, 363 S.E.2d 665, 669 (1988).  "When a defendant has asserted the statute of limitations as an affirmative defense, the burden rests on the plaintiff to prove that his claims were timely filed."  White v. Consol. Planning, Inc., 166 N.C. App. 283, 305, 603 S.E.2d 147, 162 (2004).

The issue of whether a cause of action is barred by the statute of limitations usually presents a mixed question of law and fact for the Court. Pembee Mfg. Corp. v. Cape Fear Constr. Co., 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). "However, when the bar is properly pleaded and the facts are admitted or are not in conflict, the question of whether the action is barred becomes one of law." Id.

The Plaintiff contends that the doctrine of equitable estoppel precludes Wachovia from asserting the statute of limitations as a defense in this case. In order for equitable estoppel to apply, the Plaintiff must demonstrate the following elements: "(1) conduct on the part of the party sought to be estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct will be acted on by the other party; and (3) knowledge, actual or constructive, of the real facts." Friedland v. Gales, 131 N.C. App. 802, 807, 509 S.E.2d 793, 796-97 (1998) (quoting Parker v. Thompson-Arthur Paving Co., 100 N.C. App. 367, 370, 396 S.E.2d 626, 628-29 (1990)). Additionally, the Plaintiff must be able to show (1) that he lacked both knowledge and the means of knowledge as to the real facts in question; and (2) that he relied upon Wachovia's conduct to his detriment. Friedland, 131 N.C. App. at 807, 509 S.E.2d at 796-97. The Plaintiff is not

required to show any actual fraud, bad faith, or an intent to mislead or deceive in order for the doctrine of equitable estoppel to apply. Duke Univ. v. Stainback, 320 N.C. 337, 341, 357 S.E.2d 690, 692 (1987). "If the debtor makes representations which mislead the creditor, who acts upon them in good faith, to the extent that he fails to commence his action in time, estoppel may arise." Id.

"[I]f the evidence gives rise to only one inference from undisputed facts, then the doctrine of equitable estoppel is a question for the court." White, 166 N.C. App. at 305, 603 S.E.2d at 162. "When, however, 'there are facts in dispute as to the existence of the elements of equitable estoppel, the issue of estoppel is for the jury.'" Id. (quoting Friedland, 131 N.C. App. at 809, 509 S.E.2d at 798).

In his Affidavit, the Plaintiff testifies that Wachovia agreed that the Plaintiff would receive an annual bonus based on a percentage of his department's net income before taxes. [Pl. Aff., Doc. 76-3 at ¶26]. The Plaintiff further testifies that beginning in 1999, "Wachovia continually . . . breached that agreement by understating profits for my department and using a methodology that prevented me from determining independently the amount of my department's actual profits." [Id.]. As such, the Plaintiff testifies, he

was "forced to rely upon Wachovia's repeated assurances that the net profit calculation was accurate," and he "had no reason to suspect that net profits had been understated until sometime after I received my 2003 bonus." [Id. at ¶27]. He further testifies that after 1998, "Wachovia repeatedly assured me . . . that I was being paid all bonuses to which I was entitled." [Id.].

Taking this forecast of evidence as true, the Court concludes that the Plaintiff has failed to show that the doctrine of equitable estoppel should apply in this case. Even if the Plaintiff is correct that Wachovia had an ongoing commitment to pay him annual bonuses based on a percentage of his department's net income before taxes, the undisputed facts show that the Plaintiff knew that at the time he received his 1999 bonus that this bonus was not calculated pursuant to a "percentage deal." Specifically, the Plaintiff testified in his deposition as follows:

> Q.   In early 2000, you received $675,000 based on your 1999 performance, correct?
>
> A.   Uh-huh (yes).
>
> Q.   Were you satisfied with that amount?
>
> A.   No, I was not.
>                         *        *        *

Q. Did you view that payment of $675,000 to you to violate any obligation that First Union owed to you with respect to payment of bonus?

A. It was too low, absolutely. *It simply wasn't consistent.* Absolutely, it was unacceptable.

Q. Wasn't consistent with what?

A. *Wasn't consistent with our deal, and that was a percentage of the NIBT* [net income before taxes]*, and then I got a percentage of that. It was too low*.

[Doc. 71-2 at 20-21] (emphasis added). Indeed, the Plaintiff testified that with respect to every bonus payment that he received for the years 1999 to 2005, he considered Wachovia to be in breach of its obligation to pay him an annual bonus based upon a percentage of his department's net income before taxes. [Pl. Dep., Doc. 71-2 at 20-21, 33, 39, 48, 57, 64]. In light of this testimony, the Plaintiff's assertion in his Affidavit that he had "no reason to suspect" any breach until after he received his 2003 bonus fails to create a genuine issue of material fact as to whether Wachovia concealed or misrepresented the true nature of the Plaintiff's bonus compensation from the Plaintiff. "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984).

The forecast of evidence presented by the parties shows that the Plaintiff was aware of the fact that Wachovia began calculating his bonus differently at least by February 2000, when he received his bonus compensation for 1999. The Plaintiff filed this action on September 2, 2005. Applying the three-year statute of limitations, any claims based on an alleged breach that occurred prior to September 2, 2002 with respect to the Plaintiff's claims for breach of contract, *quantum meruit*, and supplementary contract are time-barred, and any claims for an alleged violation of the North Carolina Wage and Hour Act which occurred prior to September 2, 2003 are time-barred.

### 3. Breach of Contract Claim

In his First Claim for Relief, the Plaintiff alleges that he and Wachovia had a contract providing that Wachovia would pay him bonus compensation based on a percentage of his department's net income before taxes, and that Wachovia's failure to pay Plaintiff his earned bonus compensation for the years 1998 to 2005 constituted a breach of contract. [Doc. 61 at ¶¶53-55].

"A contract is an agreement, upon sufficient consideration, to do or not to do a particular thing." N. & W. Overall Co. v. Holmes, 186 N.C. 428, 431, 119 S.E. 817, 818 (1923). A contract may be "express or implied, executed

or executory, [and] results from the concurrence of minds of two or more persons . . . . [I]ts legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it.  It is not what either thinks, but what both agree."  Arndt v. First Union Nat'l Bank, 170 N.C. App. 518, 522, 613 S.E.2d 274, 278 (2005) (quoting Holmes, 186 N.C. at 431-32, 119 S.E. at 818-19).

As the Court has held that the statute of limitation bars the Plaintiff's contractual claims arising before September 2, 2002, the Plaintiff's breach of contract claim with respect to his bonus compensation for the years 1998 through 2001 are dismissed as time barred.  Thus, the Plaintiff's breach of contract claim is limited to the bonus compensation he claims he should have received for the years 2002 and following.

In arguing that there are material issues of fact which preclude summary judgment on his breach of contract claim, the Plaintiff relies heavily upon Arndt v. First Union National Bank, 170 N.C. App. 518, 613 S.E.2d 273 (2005), arguing that the facts in that case are "virtually identical" to the case at bar.  In Arndt, the plaintiff Don Arndt was employed from 1996 to 2001 in the Structured Products Group for FU.  Id. at 520, 613 S.E.2d at 276.  Arndt and Brian Simpson orally agreed that Arndt would be paid 20% of the

Structured Products Group net income.  Id. at 522, 613 S.E.2d at 278.  This oral agreement had no expiration date and was separate from the incentive plans applicable to other employees.  Id.  FU paid Arndt bonus compensation for the years 1997 to 1999 in accordance with this oral agreement.  Id.  In 2001, however, FU paid Arndt a reduced bonus for the year 2000.  Arndt immediately contact Human Resources regarding this decrease in compensation.  After it became apparent that FU would not pay Arndt according to the prior bonus structure, Arndt filed suit for breach of contract.  Based upon the evidence of the parties' oral agreement, a jury found that FU had breached its oral contract with Arndt concerning payment of his bonus compensation and awarded him damages.  Id. at 520, 613 S.E.2d at 277.

Like the plaintiff in Arndt, the Plaintiff alleges that he was promised at the time of his hiring that his bonus compensation would be based upon a percentage of his department's net income before taxes[5], and he asserts that

_____

[5]While the Plaintiff alleges in his Amended Complaint that he was promised an annual incentive bonus based upon department's net income before taxes, it is evident from the Plaintiff's own testimony that it was his understanding that he was promised that his *department's bonus pool* would be equal to a certain percentage of his department's net income.  The Plaintiff's individual bonus compensation was not based upon a certain percentage of this income but was rather subjectively selected by the Plaintiff himself:

> [I]n 1996, I was promised an annual incentive bonus based
> upon the profits of my new business at FU.  I accepted these

he was paid in accordance with this agreement until 1999. The Plaintiff's case, however, is distinguishable from Arndt in several different respects.

In Arndt, the plaintiff presented evidence that his bonus compensation agreement did not have an expiration date and was separate from incentive plans offered to other employees within his department. Id. at 522, 613 S.E.2d at 278. Unlike the plaintiff in Arndt, the Plaintiff in the present case has failed to present a forecast of evidence to show that Wachovia promised to continue calculating the bonus pool based upon a percentage of net income indefinitely. Nor has the Plaintiff presented a forecast of evidence that his bonus compensation plan was separate from incentive plans offered to other employees within the Plaintiff's department. Indeed, the Plaintiff testified that bonus compensation he received pursuant to the 1997 and 1998 Incentive Compensation Programs accurately reflected the oral agreement he reached with Wachovia with respect to his bonus compensation. [Pl. Dep.,

---

terms and *was later told* that this annual incentive bonus pool would be equal to 9% of the net profit of the commercial servicing business. *From the 9% bonus pool, I had the discretion to allocate any portion of the bonus pool to me* and/or allocate a portion thereof to my employees. *The 1996 Incentive Plan accurately reflected the compensation packages I had been promised by Simpson and Annable.*

[Pl. Aff., Doc. 76-3 at ¶8] (emphasis added).

Doc. 71-2 at 15, 18]. The 1997 and 1998 Incentive Compensation Programs applied only from January 1 to December 31 of the applicable year. Thus, by their own terms, these incentive plans contained expiration dates.

Another critical distinction between Arndt and the Plaintiff's case is that in Arndt, the plaintiff immediately quit his employment and filed suit after receiving a bonus that was not in accordance with his oral agreement. See 170 N.C. App. at 520-21,613 S.E.2d at 277. The Plaintiff, on the other hand, despite being notified of the changes to the calculation of his bonus compensation for 1999, continued to work and accepted the bonus compensation offered to him at the end of the year. As the North Carolina Court of Appeals stated in Arndt:

> The employer, in an at will relationship, can modify, unilaterally the future compensation to be paid to an employee. If the employer modifies the terms of an [employee] at will; and, the employee knows of the change, the employee is deemed to have *acquiesced* to the modified terms, if he continues the employment relationship.

Arndt, 170 N.C. App. at 526, 613 S.E.2d at 280 (emphasis in original). The following year, the Plaintiff was again paid based on the changed incentive plan, and again the Plaintiff accepted this compensation and continued to work. In all, the Plaintiff received bonus payments for an additional *five years*

after the first bonus payment which he considered in breach of his contract.

As such, the Plaintiff acquiesced to the modified incentive compensation

plans.  By acquiescing to these modifications, the Plaintiff effectively waived

his breach of contract claims.   As the North Carolina Supreme Court has

explained:

> It is well settled . . . that after one party has breached a contractual provision, the non-breaching party has a choice between alternate courses of conduct.  He may terminate his further liability and recover damages or he may continue his contract, choosing to receive the promisee's defective performance and regarding his right to damages as adequate compensation.  Where the promisor chooses the second alternative, cases speak of the promisor's waiver by continuing to perform or to receive performance.  Because such a waiver is not a mere promise, but is instead a continuation of performance, sometimes called an election by conduct, it is binding without consideration or estoppel.

Wheeler v. Wheeler, 299 N.C. 633, 637, 263 S.E.2d 763, 765 (1980).  For

these reasons, the Court concludes that Plaintiff's continued performance of

his job and receipt of bonus payments constituted a waiver of any alleged

breach of contract related to his bonus compensation for the years 1999 to

2002.

The Plaintiff's claims for breach of contract related to the bonus payments for 2003 and 2004 also must fail. The Plaintiff admits that when he accepted a new position in 2003 as manager of the ABS group, he was not promised a percentage bonus arrangement in connection with this new position. [Pl. Dep., Doc. 71-2 at 50]. The Plaintiff received an offer letter with the terms of the new job, stating he would be a participant in the Fixed Income Incentive Program. [Pl. Dep. Exs. 30, 31, Doc. 71-4 at 30, 33]. Although the Plaintiff did not sign the offer letter, he began working in this new position, [Pl. Dep., Doc. 71-2 at 51], and thus accepted its terms. See Martin v. Airborne Express, 16 F. Supp. 2d 623, 632 (E.D.N.C. 1996) ("Under North Carolina law, '[e]mployment contracts which are terminable at will may be modified at any time by either party with the continuance of the relationship serving as the consideration for the modification.'") (quoting Fraver v. N.C. Farm Bureau Mut. Ins. Co., 69 N.C. App. 733, 318 S.E.2d 340, 344 (1984)) As such, the Plaintiff has no basis for a breach of contract claim for the bonus compensation paid in connection with this new position.

The Plaintiff's claim for a bonus for the year 2005 also must fail because under the terms of the 2005 Incentive Compensation Program, the Plaintiff was not eligible for a bonus for the partial year that he was employed in 2005,

as he was not employed on the Pay-Out Notification Date, i.e., the date on which participants are informed of the amount of their incentive award, which generally occurs after the end of the performance year, in late January of the following year.  [Bradshaw Aff., Doc. 71-6 at ¶15]

For all of these reasons, Plaintiff's breach of contract claim must be dismissed.

### 4.    North Carolina Wage and Hour Act Claim

In his Second Claim for Relief, the Plaintiff contends that Wachovia's "unilateral modification of Plaintiff's bonus compensation structure, and its failure to provide Plaintiff of said changes," constitutes a violation of the North Carolina Wage and Hour Act.  [Doc. 61 at ¶59].

Under the North Carolina Wage and Hour Act, an employer must notify its employees in writing or through a notice posted and maintained in a place that is accessible to its employees of any changes in promised wages.  N.C. Gen. Stat. §95-25.13(3).  Based upon the Court's determination that the statute of limitations bars the Plaintiff's Wage and Hour Act claims prior to September 2, 2003, the only bonus payments which are at issue with respect

to this claim are the bonus payments made in February 2004 for the year 2003 and the bonus payment made in February 2005 for the year 2004.[6]

The Plaintiff again relies upon the similarities of this case to the facts in Arndt in arguing that summary judgment is not appropriate as to his claims. In Arndt, the court found that FU failed to give Arndt oral or written notice of the change in the bonus calculation formula and thus violated the North Carolina Wage and Hour Act.  See 170 N.C. App. at 520, 522-23, 613 S.E.2d at 276, 278.  Specifically, the Court found that although FU provided notice to the plaintiff of the changes to the 1999 and 2000 incentive plans, the evidence showed that the plaintiff's bonus and compensation structure was unique to him and different from the generic incentive plans applicable to other employees.  Id. at 524-25, 613 S.E.2d at 279.  As such, the Court concluded, the notice that FU provided in accordance with the North Caroline Wage and Hour Act simply did not apply to the plaintiff.  Id. at 525, 613 S.E.2d at 279.  By contrast, the Plaintiff in the present case has failed to present a

_____

[6]The Plaintiff's claim for a 2005 bonus under the North Carolina Wage and Hour Act must be dismissed.  Under the terms of the 2005 Incentive Compensation Program, the Plaintiff was not eligible for a bonus for the partial year that he was employed in 2005 because not employed on the Pay-Out Notification Date, i.e., the date on which participants are informed of the amount of their incentive award, which generally occurs after the end of the performance year, in late January of the following year.  [Bradshaw Aff., Doc. 71-6 at ¶15].

forecast of evidence to show that his bonus and compensation structure was any different from the incentive plans applicable to the other employees in his department. As such, the Plaintiff cannot assert that the notice provided by Wachovia of the changes to the incentive plans did not apply to him. Plaintiff's reliance on <u>Arndt</u> is simply misplaced.

It is undisputed that the Plaintiff was made aware of the change to FU's incentive plans through various meetings which were held in 1999. [Pl. Dep., Doc. 71-2 at 22-30; Bradshaw Dep., Doc. 71-9 at 24-25]. In 2000, the Plaintiff attended a series of meetings concerning the development of the 2000 Incentive Plan. [Pl. Dep., Doc. 71-2 at 25]. The Plaintiff worked with Deidre Bradshaw, the H.R. Business partner for his group, to draft the SPS Compensation Scorecard that was incorporated in the 2000 Incentive Compensation Program. [Pl. Dep., Doc. 71-2 at 31-32, 34; Pl. Dep. Ex. 14 and 16, Docs. 71-3 at 17 and 19]. Also attached to the 2000 Incentive Compensation Program was a document entitled "Linkage between Scorecard and Incentive Payments," which explicitly stated that a "subjective bonus pool" would be created for SPS; that the bonus pool would be "subjectively divided" among the operating businesses within Structured Products and Real Estate Capital Markets based on market compensation

levels and on the business units' Balanced Scorecard results; and that individual compensation decisions would "be made subjectively." [Pl. Dep. Ex. 14, Doc. 71-3 at 18]. Also in 2000, the Plaintiff received a memo entitled "Compensation Communication, Manager Talking Points," which included talking points for compensation communications with employees in his group. This memo reiterated that numerous factors were considered in determining an individual's annual incentive payment, including the performance of the employee's specific business unit; the performance of the company as a whole; the performance of the overall financial industry; and the individual employee's contribution. [Pl. Dep., Doc. 71-2 at 36-37; Pl. Dep. Ex. 19, Doc. 71-3 at 55; Bradshaw Aff., Doc. 71-6 at ¶8; Bradshaw Aff. Ex. J, Doc. 71-8 at 29]. Thirteen managers, including the Plaintiff and his managers, received these talking points memoranda each year in preparation for their bonus discussions with their employees. [Bradshaw Aff., Doc. 71-6 at 8]. Beginning in January 2002, these memos specifically referred to "year end subjective incentive payments." [Bradshaw Aff. Ex. J, Doc. 71-8 at 33, 35, 37].

On September 3, 2002, Church received a memo via e-mail regarding Wachovia's incentive compensation philosophy. [Pl. Dep., Doc. 71-2 at 42-43; Pl. Dep. Ex. 26, Doc. 71-4 at 22]. It specifically stated, "[i]n all cases,

performance will be evaluated utilizing a variety of objective and subjective factors as defined by each business unit" and "[a]ll business unit pools will be determined subjectively . . . ." [Pl. Dep. Ex. 26, Doc. 71-4 at 23]. The Plaintiff acknowledged receipt of the e-mail. [Pl. Dep., Doc. 71-2 at 42-43].

In October 2003, the Plaintiff attended two offsite meetings where Wachovia's use of a subjective bonus plan was discussed and communicated in writing. Wachovia reiterated via written PowerPoint slides: "REPEAT: We have a subjective compensation plan – no hard % deals." [Pl. Dep., Doc. 71-2 at 35; Pl. Dep. Ex.18, doc. 71-3 at 53]. Later that same month, the Plaintiff attended an October 22, 2003 offsite meeting where it was again reiterated via written PowerPoint slides that there are "[n]o individual formulaic incentive payouts in fixed income [incentive program]." [Pl. Dep., Doc. 71-2 at 54-55; Pl. Dep. Ex. 34, Doc. 71-5 at 14]. The Plaintiff did not express any objection to these statements during or after these meetings. [Pl. Dep., Doc. 71-2 at 55-56]. Additionally, beginning in late 2003, Wachovia's incentive plans were posted on its intranet annually and were readily accessible by the Plaintiff. [Bradshaw Aff., Doc. 71-6 at ¶8].

This evidence establishes that the Plaintiff was presented with ample notice of the changes to the annual incentive plans prior to the changes being

implemented.  Accordingly, the Plaintiff's claim for violations of the North Carolina Wage and Hour Act must fail.

### 5.  *Quantum Meruit* Claim

In his Third Claim for Relief, the Plaintiff alleges in the alternative that the Plaintiff is entitled to a recovery from Wachovia in *quantum meruit*.  [Doc. 61 at ¶63].

"In order to prevent unjust enrichment, a plaintiff may recover in *quantum meruit* on an implied contract theory for the reasonable value of services rendered to and accepted by a defendant." Horack v. Southern Real Estate Co. of Charlotte, Inc., 150 N.C. App. 305, 311, 563 S.E.2d 47, 52 (N.C. Ct. App. 2002).  Courts, however, will impose a *quasi* contract or a contract implied in law only in the absence of an express agreement.  Pritchett & Burch, PLLC v. Boyd, 169 N.C. App. 118, 124, 609 S.E.2d 439, 443 (2005). The equitable remedy of *quantum meruit* "is not an appropriate remedy when there is an actual agreement between the parties." Whitfield v. Gilchrist, 348 N.C. 39, 42, 497 S.E.2d 412, 414 (1998).

In the present case, the forecast of evidence presented by the parties establishes that the Plaintiff and Wachovia entered into an express contract with respect to Plaintiff's bonus compensation.   Having presented evidence

only of an express contract, the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that the Plaintiff is entitled to *quantum meruit*.  See Horack, 150 N.C. App. at 311-312, 563 S.E.2d at 52.  As such, Plaintiff's *quantum meruit* claim must be dismissed.

### 6.    Breach of Supplementary Contract Claim

In his Fourth Claim for Relief, the Plaintiff asserts a claim for breach of supplementary contract pertaining only to his compensation for 2003. Specifically, he alleges that during that year, Wachovia induced him to perform by promising him the opportunity to earn "substantial bonuses" in the range of 10% of net profit, thereby creating a supplementary contract.  [Doc. 61 at ¶¶42, 65].  The Plaintiff does not appear to make a claim for breach of supplementary contract prior to 2003.  [Id.].

"A bonus offered by an employer to an employe[e] as an inducement to the employee to render more efficient service over a stipulated period of time, is not a gratuity or gift; and, when the employee accepts the offer and enters the service of the employer, 'it becomes a supplementary contract of which he cannot be deprived without sufficient cause.'"  Chew v. Leonard, 228 N.C. 181, 183, 44 S.E.2d 869, 870 (1947) (quoting Roberts v. Mays Mills, 184 N.C. 406, 114 S.E. 530, 532 (1922)).

The Plaintiff testified in his deposition that in 2003, he was offered a different position with a bonus range of $350,000 to $500,000. He specifically admitted, however, that Wachovia did not offer a bonus based upon a percentage of net income:

> Q. Were you promised any percentage bonus arrangements in connection with this new position you took in 2003?
>
> A. There was no percentage given as a – no, there was no percentage given.

[Pl. Dep., Doc. 71-2 at 50]. In light of the Plaintiff's own testimony that his bonus compensation in connection with the position he assumed in 2003 was not based on a certain percentage of net profit, the Plaintiff's claim for breach of supplementary contract must be dismissed.

For the foregoing reasons, the Defendants' Motion for Summary Judgment on Plaintiff's First, Second, Third and Fourth Claims for Relief [Doc. 70] is granted.

## III. MOTIONS TO EXCLUDE EXPERT TESTIMONY

Wachovia moves to exclude the testimony of the Plaintiff's proposed damages expert, Elizabeth Becker. [Doc. 72]. The Plaintiff moves to exclude the testimony of Wachovia's proposed expert witness, Alan M. Johnson. [Doc.

83].  The Plaintiff further moves for leave to file a supplemental memorandum in support of his Motion to Exclude.  [Doc. 85].  Wachovia does not oppose the Plaintiff's request to file a supplemental memorandum.  [Doc. 88].

The Plaintiff's Motion for Leave to File a Supplemental Memorandum in support of his Motion to Exclude [Doc. 85], which is not opposed by Wachovia, will be allowed. Because the anticipated testimony of both of these experts relates to the Plaintiff's state law claims which have been dismissed, the Court need not reach the parties' motions to exclude these witnesses.  As such, the Defendants' Motion to Exclude Plaintiff's Proposed Expert [Doc. 72] and the Plaintiff's Motion to Exclude Defendant's Proposed Expert Testimony [Doc. 83] will both be denied as moot.

## IV.   MOTION TO RECONSIDER MAGISTRATE JUDGE'S ORDER

On April 30, 2008, Wachovia filed a Motion to Compel [Doc. 67], seeking to compel the Plaintiff to produce his income tax returns and all supporting statements and schedules for the years 1995 to 2005.   The Plaintiff filed a Memorandum in Opposition to Wachovia's Motion, arguing that the discovery request was unreasonable and oppressive.  [Doc. 69].  In this responsive brief, the Plaintiff further requested that the Court impose

sanctions against Wachovia for its "unwarranted delays in producing e-mail correspondence first requested in March, 2006 ...."  [Doc. 69 at 2].

On July 2, 2008, Magistrate Judge Horn entered an Order [Doc. 80] granting Wachovia's Motion to Compel, finding that the requested discovery "may well lead to the discovery of admissible evidence," in that evidence of Plaintiff's outside business interests could tend to show that the Plaintiff's commitment to Wachovia was diminished during this time period.   [Id. at 4]. With respect to the Plaintiff's request for sanctions, the Magistrate Judge noted that the Plaintiff violated Local Rule 7.1(C)(2) by including his motion for sanctions within a responsive brief; that the Plaintiff's request for sanctions was not timely filed, as Plaintiff's Motion to Compel the production of the subject e-mails had been ruled upon months earlier; and that the Plaintiff had not provided any evidence of Wachovia's bad faith in producing the requested discovery.  Accordingly, the Magistrate Judge denied the Plaintiff's request for sanctions.  [Id. at 5-6].

A Magistrate Judge has the authority to enter a final order as to non-dispositive discovery matters.  See 28 U.S.C. § 636(b)(1)(A).  A Magistrate Judge's Order with respect to non-dispositive issues is subject to review only for rulings contrary to law or for clear error.  Id.  "Therefore, unless the result

compelled by the Magistrate Judge's ruling is contrary to law or clearly erroneous, the Orders of the Magistrate Judge will be affirmed."  Food Lion, Inc. v. Capital Cities/ABC, Inc., 951 F.Supp. 1211, 1213 (M.D.N.C. 1996).

A party may file written objections to a Magistrate Judge's Order within ten days of service of such Order.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a).  Such objections must be made "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." United States v. Midgette, 478 F.3d 616, 622 (4th Cir.), cert. denied, 127 S.Ct. 3032, 168 L.Ed.2d 749 (2007).  The Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the Magistrate Judge to which no objections have been raised.  Thomas v. Arn, 474 U.S. 140, 150, 106 S. Ct. 466, 472, 88 L. Ed. 2d 435 (1985). Additionally, the Court need not conduct a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error" in the Magistrate Judge's Order.  Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982).

The Plaintiff has failed to file written objections that specifically identify the portions of the Magistrate Judge's Order to which objections are made and the basis for such objections.  Rather, the Plaintiff merely expresses

disagreement with the Magistrate Judge's Order and summarizes what he has presented before. "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an objection as that term is used in this context." Mercam, Inc. v. Portlyn, Inc., No. 1:06cv185, 2007 WL 152121, at *1 (W.D.N.C. Jan. 17, 2007) (quoting Aldrich v. Bock, 327 F.Supp.2d 743, 747 (E.D. Mich. 2004)). No proper objection having been made to the Magistrate Judge's Order, the Court "need 'only satisfy itself that there is no clear error on the face of the record.'" Mercam, 2007 WL 152121, at *1 (quoting Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005)).

Having carefully reviewed the Magistrate Judge's Order, the Court concludes that the Magistrate Judge's findings of fact are supported by the record and that his conclusions of law are consistent with current case law. Accordingly, Plaintiff's Motion to Reconsider Magistrate's Memorandum and Order of July 2, 2008 [Doc. 81] will be denied.


# O R D E R

For the foregoing reasons, **IT IS, THEREFORE, ORDERED** that:

(1) Defendants' Motion for Summary Judgment on Plaintiff's First, Second, Third and Fourth Claims for Relief [Doc. 70] is **GRANTED**;

(2) Plaintiff's Motion for Leave to File Plaintiff's Supplemental Memorandum in Support of Motion to Exclude Defendant's Proposed Expert Testimony [Doc. 85] is **ALLOWED**;

(3) Defendants' Motion to Exclude Plaintiff's Proposed Expert [Doc. 72] and Plaintiff's Motion to Exclude Defendant's Proposed Expert Testimony [Doc. 83] are **DENIED AS MOOT**; and

(4) Plaintiff's Motion to Reconsider Magistrate's Memorandum and Order of July 2, 2008 [Doc. 81] is **DENIED**.

**IT IS SO ORDERED**.

Signed: December 30, 2008

Martin Reidinger
United States District Judge